**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 16a0473n.06**

No. 14-6533

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Aug 16, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| BETSY HILLIS, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

**BEFORE: KEITH, CLAY, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Betsy Hillis was convicted of conspiracy to manufacture methamphetamine and conspiracy to possess and distribute pseudoephedrine with cause to believe the pseudoephedrine would be used to manufacture methamphetamine. Over Hillis's objection at trial, the government introduced pharmacy records identifying Hillis as the purchaser of pseudoephedrine. Hillis now appeals, arguing (1) the pharmacy records constituted inadmissible hearsay and their admission violated her right of confrontation, and (2) the government presented insufficient evidence of her guilt. We **AFFIRM**.

**I.**

Hillis was charged in a superseding indictment with conspiracy to manufacture and distribute 50 grams or more of actual methamphetamine or 500 grams or more of a mixture and substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 (Count One); and conspiracy to possess and distribute pseudoephedrine with cause to believe it would be used to manufacture methamphetamine, in violation of 21 U.S.C.

§§ 841(c)(2) and 846 (Count Two). A second superseding indictment added charges of obstructing an official proceeding (Count Three), and making a materially false statement to law enforcement (Count Four). By the time the second superseding indictment was returned, all nine of Hillis's alleged co-conspirators charged in previous indictments had pled guilty to Count One (or a lesser included charge) pursuant to a plea agreement.

Prior to trial, Hillis filed a motion in limine seeking to exclude summary records of pseudoephedrine transactions from seven pharmacies that identified Hillis as the purchaser by name, address, and driver's license number. Each of the seven pharmacy records included a certificate of authentication from a records custodian. Relying on *United States v. Towns*, 718 F.3d 404 (5th Cir. 2013), the district court denied the motion, finding that the pharmacy records fit within the business-records hearsay exception, Fed. R. Evid. 803(6), and that the admission of the records did not implicate the Confrontation Clause because they were nontestimonial.

At trial, the government presented witnesses from two of the pharmacies—a loss prevention manager from Walgreens and a pharmacist from Wal-Mart. The witnesses testified that employees selling the pseudoephedrine are required to obtain photo identification from the customer and compare the photograph to the customer. After obtaining identification, the employees manually key the customer's name and address into the system. The witnesses also testified about the training each employee received on this process and the consequences of failing to comply, including possible termination and civil fines for pharmacists. The witnesses also explained that in 2011, after Hillis's involvement in the conspiracy, Tennessee law became stricter by limiting the class of employees authorized to make pseudoephedrine sales. Neither of the witnesses observed the purchases at issue in this case.

Special Agent Stephen Gordy of the ATF testified that pharmacy records of pseudoephedrine purchases are compiled in the Tennessee Meth Information System (TMIS) to allow law enforcement to detect suspicious purchasing of pseudoephedrine, a necessary ingredient for methamphetamine. The TMIS is often used as a starting point in investigating methamphetamine activity and was one of the primary tools in this investigation. Gordy testified that the pharmacy records reflect Hillis making many pseudoephedrine purchases at or near the same times and locations as her codefendants, sometimes making multiple pseudoephedrine purchases on the same day. Gordy also compared the pharmacy records with Hillis's bank records to show that approximately ten pseudoephedrine purchases were made with Hillis's bank card.[1] Gordy further explained that Hillis's bank card was used in stores near the pharmacies from which pseudoephedrine was purchased by Hillis's codefendants at around the same time. Gordy concluded that the purchase patterns were consistent with a methamphetamine-manufacturing conspiracy.

Other evidence presented at trial included the testimony of a law-enforcement officer, who described the seizure of methamphetamine-manufacturing equipment and ingredients belonging to codefendants Jeremy Rigsby and Jacob Barnes, which prompted the investigation that led to Hillis. In addition, several of Hillis's codefendants testified about Hillis's involvement in the conspiracy. Rigsby testified that Hillis was his girlfriend on and off during the conspiracy; that he and Hillis purchased pseudoephedrine together on dates reflected in the pharmacy records; that all the pseudoephedrine they purchased was used to make methamphetamine; and that Hillis used methamphetamine with him and helped with some of the prep work to manufacture it. Grant Turner, Rigsby's brother, similarly testified that Hillis

---

[1] The government's exhibit in the record on appeal shows at least fifteen pseudoephedrine purchases with Hillis's bank card over a 29-month period.

accompanied him to purchase pseudoephedrine used to make methamphetamine and that Hillis had helped with prep work at her apartment. Lori Cope testified that she used methamphetamine with Hillis around 2008. Gabriel Womack testified that Hillis traded pseudoephedrine pills for methamphetamine that Womack manufactured.

After the government rested, Hillis testified that she had suffered from allergies or sinus issues since she was a child, which she treated with regular use of pseudoephedrine.[2] Hillis also testified that she almost always used her bank card when she made purchases. She admitted that she purchased the pseudoephedrine when the records reflected that her bank card was used, but denied that she made any of the other pseudoephedrine purchases reflected in the pharmacy records. To explain those non-bank card purchases, she testified that she lost her driver's license in October 2000 and had it replaced. Then, a couple of weeks later, she found the lost license so she had an extra driver's license. Hillis testified that she dated Rigsby from 2001 or 2002 until 2005 or 2006, and that Rigsby was aware of her extra license. According to Hillis, Rigsby took her license and gave it to Cope and another woman to use to purchase pseudoephedrine. When confronted with records showing that she made purchases with her bank card minutes apart from codefendants' purchases at the same store, or that she used her bank card in stores in the same city at approximately the same time her driver's license was being used to purchase pseudoephedrine, Hillis agreed with the government that these occurrences were the result of a "terrible coincidence." (R. 481: Trial Tr., PID 2032-40.)

---

[2] Amber Luna, who worked with Hillis from 2009 to 2012, testified that Hillis was "constantly congested or allergies or sinuses or something" and took medication "constantly" for her symptoms.

The jury returned guilty verdicts on Counts 1 and 2.[3] Hillis was sentenced to 120 months' imprisonment as to each count, to be served concurrently. She now appeals her conviction.

## II.

### A.

Hillis first argues that her conviction should be overturned because the pharmacy records constitute inadmissible hearsay. We review a district court's evidentiary rulings for abuse of discretion. *United States v. Cecil*, 615 F.3d 678, 688 (6th Cir. 2010) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *United States v. Blackwell*, 459 F.3d 739, 752 (6th Cir. 2006)). "[I]t is an abuse of discretion to make errors of law or clear errors of factual determination." *United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005).

The district court determined that the pharmacy records were admissible under Federal Rule of Evidence 803(6), which provides an exception to the rule against hearsay for:

> **(6) Records of a Regularly Conducted Activity.** A record of an act, event, condition, opinion, or diagnosis if:
> **(A)** the record was made at or near the time by—or from information transmitted by—someone with knowledge;
> **(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> **(C)** making the record was a regular practice of that activity;
> **(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11)[4] or (12) or with a statute permitting certification; and

---

[3] The district court had previously granted in part Hillis's Rule 29 motion as to the portion of Count One charging conspiracy to *distribute* methamphetamine, but preserved the portion of Count One charging conspiracy to *manufacture* methamphetamine. Counts Three and Four were severed and later dismissed.

[4] Federal Rule of Evidence 902(11) provides:
> The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the

> **(E)** the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.[5]

Hillis contends that the pharmacy pseudoephedrine records fail to meet the requirements of Rule 803(6) because they (1) were made primarily for law-enforcement purposes rather than in the regular course of business, (2) lack trustworthiness, (3) were made using information supplied by an individual outside the regular practice of the business activity, and (4) constitute double hearsay because some of the information was provided by the person furnishing a driver's license when purchasing pseudoephedrine.

### 1. The records were made in the regular course of business

Several circuits have addressed the admissibility of pseudoephedrine-purchase records, although none has addressed all the arguments Hillis makes here. In *United States v. Collins*, this court upheld the admission of "MethCheck"[6] records under Rule 803(6), rejecting the defendant's argument that the government did not lay the requisite foundation because it introduced the records through law-enforcement officers rather than a custodian of records, an argument that Hillis does not advance on this appeal. 799 F.3d 554, 583-84 (6th Cir. 2015). But *Collins* does not address whether the records otherwise meet the business-records exception to hearsay, and thus does not address any of the arguments Hillis raises on appeal. The Eighth

---

intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them.

[5] Subsection (E) was amended in December 2014 to make clear that the burden to show lack of trustworthiness is on the opponent of the evidence. Prior to the amendment, subsection (E) provided: "neither the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."

[6] MethCheck is a service provided by a public safety technology company that electronically tracks in real time the purchase of precursors for methamphetamine. *United States v. Collins*, 799 F.3d 554, 583 (6th Cir. 2015). When a customer attempts to purchase a medication that is identified as a methamphetamine precursor, the pharmacy employee scans or manually enters the customer's government identification information into the MethCheck System, and the employee receives a nearly instantaneous message confirming whether the sale is legal or illegal (based on purchase quantity regulations). *Id.* This purchase information becomes available to law enforcement in under a minute. *Id.*

Circuit has also upheld pseudoephedrine-purchase records as business records, but the cases provide minimal analysis. *See United States v. Wells*, 706 F.3d 908, 913 (8th Cir. 2013); *United States v. Mashek*, 606 F.3d 922, 930 (8th Cir. 2010).

The Fifth Circuit's opinion in *Towns*, relied on by the district court, squarely addresses whether pharmacy pseudoephedrine-purchase records are made in the regular course of business. In *Towns*, Texas law required pharmacies to keep records of pseudoephedrine purchases. 718 F.3d at 408. At trial, records that had been gathered from the pharmacies by law-enforcement officers were introduced to show the defendant's participation in a conspiracy to manufacture methamphetamine and to possess and distribute pseudoephedrine knowing that it would be used to manufacture methamphetamine. *Id.* at 406-07. On appeal, the defendant challenged the admission of the records on the ground that they were prepared for law enforcement, rather than for business purposes, and they were introduced by a law-enforcement officer rather than someone with knowledge of the records. *Id.* at 408.

The court rejected both arguments. As to the first argument, the court explained that "the undue focus on the law enforcement purpose of the records has little to do with whether they are business records under the Federal Rules of Evidence" because "[w]hat matters is that they were kept in the ordinary course of business. It is not uncommon for a business to perform certain tasks that it would not otherwise undertake in order to fulfill governmental regulations." *Id.* Accordingly, the court concluded that selling pills containing pseudoephedrine is a regularly conducted activity, and the purchase records of those pills are made in the course of that activity. *Id.*

In rejecting defendant's second argument, the court explained that the affidavit of a records custodian is sufficient to lay the foundation for a business record under Rule 902(11),

and thus there is no need to require cashiers from each pharmacy to testify.  *Id.* at 409-10.  The court was also unpersuaded by defendant's argument that the records were not accurate, reasoning that the defendant was free to make arguments at trial that he did not purchase the pills, but that "accuracy does not control admissibility."  *Id.* at 410.

Judge Graves dissented, relying on Fifth Circuit precedent and reasoning that the pseudoephedrine logs were prepared in accordance with state and federal law for law-enforcement purposes, and thus the pharmacies do not "necessarily rely" upon the records to conduct their own affairs.  *Id.* at 418 (Graves, J., dissenting) (citing *United States v. Veytia-Bravo*, 603 F.2d 1187, 1191 (5th Cir. 1979); *Matthews v. United States*, 217 F.2d 409, 413-14 (5th Cir. 1954)).  Judge Graves reasoned that because the pharmacies do not rely on the records for their own affairs, the pharmacies lack an incentive to keep precise records, and the records therefore have untested accuracy and reliability.  *Id.* at 418-19.  Judge Graves also concluded that the records were not properly authenticated, reasoning that the certificates of authentication were insufficient because they did not explain the record-keeping system of the organization, and the sponsoring witness failed to shed light on the record-keeping systems or vouch that the requirements of Rule 803(6) were met.  *Id.* at 419-20.

Hillis echoes Judge Graves's dissent in *Towns* and argues that the pharmacy records were not made in the regular course of business because their primary utility is for law enforcement. Hillis additionally relies on *Palmer v. Hoffman*, 318 U.S. 109 (1943).  *Palmer* involved an accident report provided by an engineer of a railroad company.  *Id.* at 111.  The Court held that the engineer's report was inadmissible because it was not made in the regular course of business, reasoning that "[a]n accident report may affect that business in the sense that it affords information on which the management may act.  It is not, however, typical of entries made

systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls." *Id.* at 113. Even if the railroad company routinely recorded its employees' versions of accidents, the Court explained, those accident reports are not made in the regular course of business because the "primary utility [of those reports] is in litigating, not in railroading." *Id.* at 114.

Although there is some appeal to Hillis's position, we decline to adopt it here. The business-records exception "is based on the indicia of reliability that attaches to a record created or maintained by an employer in the ordinary or regular course of their business. An employer's independent motivation for creating and maintaining reliable business records obviates the need for sworn testimony and cross-examination." *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 588 (6th Cir. 2009). As the majority in *Towns* recognized, pharmacies are required by law to record pseudoephedrine purchases, *see* Tenn. Code Ann. § 39-17-431; 21 U.S.C. § 830, and thus the recording of these purchases is made by the employer in the ordinary course of its business of selling pseudoephedrine products. 718 F.3d at 406, 408. That the laws requiring pharmacies to track these purchases were enacted, at least in part, for law-enforcement purposes does not detract from the reliability of the records. This is not a case like *Palmer*, where the pharmacies may have a motivation to misrepresent for an advantage in litigation. *See Palmer*, 318 U.S. at 113 (approving as business records those "entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls"). Rather, the adverse consequences for pharmacists and pharmacies for failure to comply with the law would seem to motivate the pharmacies to keep accurate records. *See* Tenn. Code Ann. § 39-17-431(f) (2005); *see also United States v. Johnson*, 971 F.2d 562, 571 (10th Cir. 1992) ("[B]ank records are particularly suitable for admission under Rule 803(6) in light of

the fastidious nature of the record keeping in financial institutions, which is often required by governmental regulation."). Accordingly, the pharmacy records were made in the regular course of business.

### 2. The pharmacy records do not lack trustworthiness

Hillis next argues that the pharmacy records are untrustworthy because there is evidence that Hillis's driver's license was stolen and used by others. This court has explained that, "once the foundation is laid, absent specific and credible evidence of untrustworthiness, 'the proper approach is to admit the evidence and permit the jury to determine the weight to be given the records.'" *Peak v. Kubota Tractor Corp.*, 559 F. App'x 517, 523 (6th Cir. 2014) (quoting *United States v. Hathaway*, 798 F.2d 902, 907 (6th Cir. 1986)).

Here, Hillis's evidence of untrustworthiness does not render the records inadmissible. First, she does not actually dispute the accuracy of the records, i.e., that the pharmacy employees accurately documented that her driver's license was furnished to purchase pseudoephedrine. Nor does she challenge the pharmacies' processes for recording the identification of the purchaser. In that sense, she is not disputing the trustworthiness of the records at all. Instead, Hillis argues that the records are untrustworthy because Rigsby stole her license and gave it to other women to purchase pseudoephedrine. But Hillis provides no support for her argument that this would render the records inadmissible.

Hillis's argument goes to the weight, rather than admissibility, of the evidence. *See Towns*, 718 F.3d at 410 ("Towns was free to make arguments at trial that he was not the actual purchaser of the drugs, but accuracy does not control admissibility."). Hillis testified that her license was stolen and used by Rigsby and co-conspirators to purchase pseudoephedrine in her name. The district court's decision to allow the jury to determine whether Hillis's explanation

was credible was not an abuse of discretion. *See Peak*, 559 F. App'x at 523; *see also Hathaway*, 798 F.2d at 906 ("It is well established that federal law favors the admission of evidence which has *any* probative value at all.").

Thus, Hillis's allegations that her license was stolen did not render the records inadmissible as untrustworthy.

### 3. The records are not inadmissible as a result of a customer providing some of the information

Hillis argues that the pharmacy records are inadmissible because the purchaser who furnishes the driver's license is a supplier of information acting outside the framework of regular business activity, and the information supplied is itself hearsay that does not fall within a hearsay exception. The advisory committee's note to Rule 803(6) explains that "[i]f . . . the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail." Fed. R. Evid. 803 advisory committee's note (6) to 1972 proposed rules. The advisory committee's note provides the example of a "police report incorporating information obtained from a bystander: the officer qualifies as acting in the regular course but the informant does not." *Id.* This court has recognized that "if the record is based on the statements of an informant rather than the first-hand observations of its author, the informant must also be acting under a business duty." *Cecil*, 615 F.3d at 690.

Nonetheless, if records contain information obtained from a customer, the information still falls within the business-records exception if the business's standard practice is to verify the information provided by the customer. *See, e.g.*, *United States v. Mitchell*, 49 F.3d 769, 778 (D.C. Cir. 1995) (citation omitted); *see also United States v. Reyes*, 157 F.3d 949, 952 (2d Cir. 1998) ("So long as the regular practice of verification is established," the records are allowed

into evidence "under the business records exception"); *United States v. McIntyre*, 997 F.2d 687, 700 (10th Cir. 1993) ("If the business entity has adequate verification or other assurance of accuracy of the information provided by the outside person, the exception may still apply. Some courts have required that the business employee recording the information be 'able in some way to verify the information provided—for example, by examining a credit card, driver's license, or other form of identification.'" (quoting *United States v. Lieberman*, 637 F.2d 95, 101 (2d Cir. 1980))); *United States v. Bland*, 961 F.2d 123, 127 (9th Cir. 1992) (holding that store records were admissible where a manager testified that his employees were "required to verify gun purchasers' names with a picture identification" and where the customers were under a "legal duty to provide truthful information").

Here, the pharmacy records have assurances of accuracy and there is evidence that the standard practice of the pharmacies is to verify the information given by purchasers. First, the pharmacies were required by law not to sell pseudoephedrine unless the purchaser provided government-issued photo identification, and pharmacists faced consequences if they did not comply. Tenn. Code Ann. § 39-17-431(d), (f) (2005). This is not a situation where a pharmacy employee was merely taking the customer at her word as to her identity, which would present a hearsay problem. Rather, the pharmacy employee was required to verify for herself the identity of the customer through her own observation of the customer and the customer's photo identification. It is the record of the pharmacy employee's observations that is at issue in this case, rather than an unverified statement by a customer.

Second, there is evidence that the law was followed in this case, because each record contains Hillis's name, address, and driver's license number, in addition to the amount of pseudoephedrine purchased. Third, the certificates provided by the pharmacy all say that the

records were made in the regular course of business as a regularly conducted business activity. Accordingly, the records qualify as business records even though some of the information was supplied by a customer.[7] *See McIntyre*, 997 F.2d at 700 ("We do not feel that in every case there must be direct testimony that an employee actually verified the information, nor is it necessary that there be an express policy that identification be checked. In some cases, the interests of the business may be such that there exists a sufficient self-interest in the accuracy of the log that we can find its contents to be trustworthy."); *see also United States v. Seelig*, 622 F.2d 207, 214 (6th Cir. 1980) ("Kopp testified that when he went into Seelig Pharmacy to investigate, he requested the records which are required to be kept for sales of schedule V drugs. Appellant Seelig handed him the records, which were later seized and from which the copies were made. The identification by Kopp and the admission by Seelig . . . establish that the records were ones of regularly conducted activity which is an exception to the hearsay rule, Rule 803(6) . . . .").

For the reasons above, the pharmacy records were properly admitted as business records.

**B.**

Hillis next argues that admission of the pharmacy records violated the Confrontation Clause. We review this claim de novo. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010).

"The Confrontation Clause guarantees a criminal defendant the right 'to be confronted with the witnesses against him,'" *United States v. Johnson*, 581 F.3d 320, 324 (6th Cir. 2009) (quoting U.S. Const. amend. VI), and bars the "admission of testimonial statements of a witness

---

[7] Additionally, witnesses from Wal-Mart and Walgreens testified that an employee selling products with pseudoephedrine reviews the driver's license and documents the necessary information prior to selling the pseudoephedrine, providing an even greater assurance of accuracy. The records from Walgreens and Wal-Mart constituted the vast majority of Hillis's pseudoephedrine purchases, including times when Hillis purchased pseudoephedrine around the same time that a codefendant purchased pseudoephedrine at the same or a nearby store. Accordingly, even if the records from the other pharmacies were improperly admitted, any error would have been harmless.

who did not appear at trial unless he was unavailable to testify" and previously subject to cross-examination, *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). "Hearsay evidence that is non-testimonial is not subject to Confrontation Clause analysis . . . ." *Collins*, 799 F.3d at 585 (quoting *United States v. Parlier*, 570 F. App'x 509, 517 (6th Cir. 2014)). A statement is "testimonial" under the Confrontation Clause if the declarant "intend[ed] to bear testimony against the accused." *Id.* (alteration in original) (quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004)). "This determination 'depends on whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.'" *Id.* (quoting *Johnson*, 581 F.3d at 325).

"Business and public records are generally admissible absent confrontation . . . because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). But, regardless whether statements qualify as business records, if those records were prepared specifically for use at trial, they are subject to confrontation. *Id.* Applying these principles, the Supreme Court has held that the Confrontation Clause bars the admission of affidavits from non-testifying forensic analysts who perform drug analysis on seized evidence, *see Melendez-Diaz*, 557 U.S. at 308-09, 324, and blood-alcohol analysis where the government relies on the testimony of an analyst familiar with the forensic procedures rather than the certifying analyst, *see Bullcoming v. New Mexico*, 564 U.S. 647, 651-52 (2011).

Hillis argues that the pharmacy records are subject to confrontation because they were created solely for law-enforcement purposes to establish a fact at trial. We rejected that argument in *Collins*:

> [U]nlike the forensic report at issue in *Bullcoming* and the affidavit at issue in *Melendez-Diaz*, the MethCheck reports at issue in this case were not made to prove the guilt or innocence of any particular individual, nor were they created for solely evidentiary purposes. Although law enforcement officers may use MethCheck records to track pseudoephedrine purchases, the MethCheck system is designed to prevent customers from purchasing illegal quantities of pseudoephedrine by indicating to the pharmacy employee whether the customer has exceeded federal or state purchasing restrictions. Furthermore, it is improbable that a pharmacy employee running a standard identification check of a customer would have anticipated that the records of that transaction would later be used against these particular defendants at trial.

799 F.3d at 586 (internal citation omitted).

Although *Collins* was decided under a plain-error standard of review, *id.* at 584, its reasoning forecloses Hillis's argument. As in *Collins*, the government presented evidence that one of the purposes of Wal-Mart's system is to reject a sale if the customer exceeded the state limit on monthly pseudoephedrine sales. Further, as explained in *Collins*, the pharmacy employees here likely would not anticipate that the records they were creating would be used against Hillis at trial. *Id.* at 586; *see also Towns*, 718 F.3d at 411 ("The pharmacies created these purchase logs *ex ante* to comply with state regulatory measures, not in response to an active prosecution. Additionally, requiring a driver's license for purchases of pseudoephedrine deters crime. The state thus has a clear interest in businesses creating these logs that extends beyond their evidentiary value. Because the purchase logs were not prepared specifically and solely for use at trial, they are not testimonial and do not violate the Confrontation Clause."). Thus, the pharmacy records here are not testimonial, and their admission did not violate the Confrontation Clause.

## C.

Finally, Hillis argues that the government presented insufficient evidence of guilt. In reviewing a sufficiency challenge, we view the evidence "in the light most favorable to the

prosecution" and will affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Henry*, 797 F.3d 371, 376 (6th Cir. 2015) (internal quotation marks omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Any 'issues of credibility' must be resolved in favor of the jury's verdict." *Collins*, 799 F.3d at 589 (quoting *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001)). "Moreover, every reasonable inference from the evidence must be drawn in the government's favor." *Cecil*, 615 F.3d at 691 (internal quotation marks omitted) (quoting *United States v. Woods*, 877 F.2d 477, 479 (6th Cir. 1989)). Accordingly, "[a] defendant challenging the sufficiency of the evidence 'bears a very heavy burden.'" *Collins*, 799 F.3d at 589 (quoting *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005)).

Hillis argues that the evidence is insufficient because (1) the government did not prove that her license was not stolen and, therefore, did not prove that she made the pseudoephedrine purchases that were not corroborated by the bank records; (2) her confirmed purchases were de minimis and consistent with her reported allergies and sinus issues; and (3) her codefendants' testimony was not credible. Hillis essentially asks us to reweigh evidence and make credibility determinations, which is inappropriate when reviewing a sufficiency challenge.

The government presented sufficient evidence to support the convictions. Codefendants testified that Hillis purchased pseudoephedrine for the purpose of giving it to Rigsby and Turner to use in manufacturing methamphetamine, traded pseudoephedrine pills for methamphetamine, and helped with preparation for manufacturing methamphetamine by stripping matches and allowing codefendants to use her apartment. This testimony was corroborated by the pharmacy records, Hillis's bank records, and Gordy's testimony explaining that the purchase patterns were consistent with a methamphetamine-manufacturing conspiracy. Based on this evidence, a

rational trier of fact could find that Hillis entered into an agreement to violate the drug laws, had knowledge of and the intent to join the conspiracy, and participated in the conspiracy. *See United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005); *see also United States v. Stewart*, 628 F.3d 246, 255, 261 (6th Cir. 2010) (affirming conviction where "the government put forth circumstantial evidence corroborating various elements of the coconspirators' testimony").

A rational juror could have rejected Hillis's explanations that her license was stolen, and that her pseudoephedrine purchases were consistent with allergies or sinus issues. Hillis could not explain why she had confirmed bank card purchases using both licenses[8] or how Rigsby could have stolen her license during the charged conspiracy if they were no longer dating as she claimed. Further, the government presented evidence that Hillis had no pseudoephedrine purchases for several months during the spring, when allergens are more prevalent, and that Hillis tested negative for known allergens.

In sum, the government presented sufficient evidence of Hillis's guilt.

**III.**

For these reasons, we **AFFIRM**.

---

[8] Hillis's address changed such that the address on her current license during the conspiracy would have differed from her extra license that she had replaced in 2000, but she made pseudoephedrine purchases using her bank card with both licenses.